GERARD B. ALLEN, ADMINISTRATOR OF EUGENE SHINE, Plaintiff in Error, v. CENTRAL SAVINGS-BANK, Defendant in Error.

May 15, 1877.

1. A contract of guaranty must be strictly construed, yet must be so construed as to carry into effect the evident intention of the parties, as it is to be gathered from the instrument itself.

2. A., a bank, had discounted the note of B. for $10,000. C. had deposited with A. for collection a note for $15,000, secured by deed of trust. C. subsequently wrote to the president of A. that, having heard that B. "could use advantageously some additional cash over and above the amount already had of your bank," etc., "if your bank will lend to B. $15,000, I shall hold myself responsible for that amount, and will leave with you, as collateral security, the note and mortgage " * * * "at present in your vault." The proposal contained in this letter was accepted, of which C. had due notice, and B. drew his check on A. for $10,000, and took up his note for

$10,000, maturing on that day. A. subsequently discounted the note of B. for $5,000. *Held*, that $15,000 was the amount which C. guaranteed to pay, and not $15,000 in addition to what B. had before received of A.; that the fact that the money was had of A., to whom B. owed a note of $10,000, and that he paid this note out of the $15,000 so advanced, made no difference in this case; and that the terms of the guarantee were complied with by A.

ERROR to St. Louis Circuit Court.

*Affirmed.*

THOMAS T. GANTT and SAMUEL REBER, for plaintiff in error: A contract of guaranty must be strictly construed. A surety cannot be charged beyond the precise terms of his contract. — *Taylor* v. *McClung*, 2 Houst. 24; *Taylor* v. *Wetmore*, 10 Ohio, 490; *Smith* v. *Montgomery*, 3 Texas, 199; *Stratton* v. *Rastall*, 2 Term Rep. 366; *Bacon* v. *Chesney*, 1 Stark. N. P. 192; *Walrath* v. *Thompson*, 6 Hill, 540; *Bigelow* v. *Benton*, 14 Barb. 123; *Dobbins* v. *Bradley*, 17 Wend. 422; *Gates* v. *McKee*, 13 N. Y. 232; *Miller* v. *Stewart*, 9 Wheat. 680.

BROADHEAD, OVERALL & BROADHEAD, for defendant in error: A contract of guaranty must receive the construction which is most probable and natural under the circumstances. — *Decatur Bank* v. *St. Louis Bank*, 21 Wall. 298; *Dobbins* v. *Bradley*, 17 Wend. 422; *Farmers' Bank* v. *Bayless et al.*, 35 Mo. 439, and 41 Mo. 287; *Lessing* v. *Sulzbacher et al.*, 35 Mo. 446; Coll. on Part. 426.

BAKEWELL, J., delivered the opinion of the court.

It appears from the pleadings and evidence in this case that Eugene Shine deposited with defendant a note made by Isaac Walker, maturing in 1870, with interest at six per cent, payable semi-annually. The note was secured by deed of trust upon real estate, and was for $15,000.

In the spring of 1868, and for some time prior thereto, one Peter O'Neil, and a son-in-law of Shine, named Doyle, were copartners in the pork business, in St. Louis, under

the name of O'Neil & Co. The bank account of the firm was kept with defendant, under the name of O'Neil alone. On January 27, 1868, defendant discounted for O'Neil & Co. a sixty-day note of that date for $10,000, endorsed by the father of Peter O'Neil. This note was held by defendant, and matured on March 30th. On the morning of that day O'Neil & Co., through Peter O'Neil, delivered to the president of defendant, to be submitted to its directors, the following letter from Eugene Shine, written by him in Ireland, and which had been received in an enclosure directed to Peter O'Neil, of the firm of O'Neil & Co. :

"88 Patrick Street, Cork, 13th March, 1868.

"*Hon. Jos. O'Neil, President of Central Savings-Bank, St. Louis, Mo.:*

"Hearing from P. O'Neil and Mr. Doyle that they could use advantageously some additional cash over and above the amount already had of your bank, and being desirous to promote their interests, and enable them to carry on their business efficiently, I will thank you to submit to your bank that if they will lend O'Neil & Co. fifteen thousand dollars I will hold myself responsible for that amount, and will leave with you as collateral security the note and mortgage of Isaac Walker, which is at present in your vault for a like sum, say $15,000. If the Central cannot conveniently make this advance, I will feel obliged to assist them in procuring it elsewhere."

The proposition contained in this letter was favorably entertained by defendant, and the proposal was accepted. At that date the account of Peter O'Neil with defendant showed $2,910.16 to the credit of O'Neil & Co. (The account, though kept in his name, being really, as has been said, the firm account). O'Neil then made and delivered to the bank his note, at sixty days, for $10,000, which was discounted, and the proceeds credited to the Peter O'Neil account. He then gave his check for $10,000, and received

the note maturing that day. O'Neil also drew two other checks against the same account on the same day, for $70 and $567.74 respectively, leaving a balance to the credit of the account of $2,094.62. Afterwards, on April 9th, the bank discounted another note of O'Neil for $5,000, the proceeds of which likewise went to the credit of the firm account kept in O'Neil's name, and were used in the business of the firm. It was admitted on the trial that Shine received due notice of the acceptance of his proposal contained in the letter of March 13, 1868, and of the discount of $15,000, made in consequence of it.

Eugene Shine arrived in St. Louis on May 20, 1868, and proceeded at once to the store of O'Niel & Co., where he opened the safe, took out and inspected the books and papers, and was informed by Peter O'Neil as to the condition of the firm, the manner in which the accounts, including the bank account, were kept, the presentation of his letter to defendant, and its acceptance of his proposal, the consequent discount of the two notes of O'Neil for the firm ; with all this he expressed himself satisfied. He was intimate with the officers of the bank, and made the banking-house of defendant his stopping-place from his arrival until June 11th. He inspected the bank account of O'Neil & Co., thanked the bank for its accommodation to them, and gave directions to the cashier and O'Neil for a renewal of the two notes of $10,000 and $5,000, which were renewed, at his request, on June 1st and 11th respectively, and were never paid. Pork was declining about June 11th, and continued to fall till June 24th, when Shine left St. Louis for Ireland. After June 11th he expressed dissatisfaction for the first time.

The only witnesses examined were Peter O'Neil and Tracy, the cashier of defendant. They state that the loan was made by the bank on the faith of Shine's letter, without conditions as to how the proceeds of the discounts should be applied, or when they should be drawn out ; that the

note maturing March 30th was not mentioned in connection with the application. Tracy says that when the letter of Shine was submitted to the discount board it was suggested that if the bank did not loan the money to O'Neil & Co. they would go elsewhere to get it, and that he was prepared to give the Walker note to O'Neil & Co. for that purpose, had Shine's proposition not been accepted.

This suit is commenced by the executor of Shine, to recover from the bank the amount of the Walker note and two years' interest upon it, collected by the defendant. The cause was submitted to the court sitting as a jury, and there was a verdict for defendant.

The plaintiff asked many declarations of law, which were all refused except the following:

"That the letter of Eugene Shine, dated 13th March, 1868, was a proposal to guarantee the Central Savings-Bank for the advance to O'Neil & Co. of $15,000 of additional cash, over and above what the said O'Neil & Co. had already had of said bank; and if the advance which the bank claims to have made to said O'Neil & Co. upon the said guaranty consists, in whole or in part, of the renewal of any advance or loan before that time made by said bank to the said O'Neil & Co., or to any member of that firm, the defence of the bank fails, and the plaintiff must have judgment."

The court therefore found as a fact that the loan for the payment of which the guaranty of Shine was given did not consist, in whole or in part, of the renewal of any previous loan or advance. There was evidence to support this finding, and it cannot be disturbed here.

Several instructions were given for defendant. It is not necessary to set them out for the purposes of this opinion.

It is contended by appellant that the terms of a contract of guaranty must be strictly complied with, and that it is manifest from the testimony that there was not, in this case, even a substantial compliance with the terms of Shine's

proposal to guaranty; and that the Walker note could not, therefore, be legally applied to the payment of the two notes discounted by defendant for O'Neil & Co.

The terms of a contract of guaranty are to be strictly construed; but this contract is not excepted from the general rule for the construction of contracts, which requires that they shall be so construed as to carry into effect the intention of the parties, as it is to be gathered from the instrument itself.

In this case the loan was made according to the recognized method of making loans by banks. Banks discount paper, giving to the borrower such a sum as, with the rate of bank interest, at the maturity of the note amounts to the sum mentioned in the note given. In this case the bank deducted $177.80 from the $10,000 loaned on the first note. The exact discount for sixty days has been calculated by counsel for appellant, and found to be $174.35. The rule of *de minimis non curat lex* is applicable here. Neither the fact that the loan was made by way of discount, nor the overcharge of $3.45, constitutes a violation of the terms of the contract of guaranty.

It is, however, very strenuously contended by counsel for appellant that, waiving these less substantial objections, it is manifest from all the circumstances of this transaction, as detailed in the evidence, that the sum called for was never furnished at all; that the transaction of March 30th was not an advance of additional money to O'Neil & Co., but a mere renewal of an existing loan, by which the bank released Peter O'Neil's father, and substituted the collateral of Shine as a new and perhaps a better security for an old and perhaps a doubtful debt; that the plain object of Shine was defeated, instead of being carried out, by this arrangement; and that whereas he desired, by providing a generous supply, to tide the vessel which carried the fortunes of his son-in-law, and of the firm of which he was a member, over a present difficulty, a wholly insufficient supply was afforded,

by which, whilst the threatened shipwreck was not averted, the circumstances of the loss were so changed that the defendant and the father of O'Neil were enabled to escape from their position of peril, and Shine was left in their place upon the wreck. This is the view taken of the transaction by counsel for appellant. We do not think that it is warranted by the facts of the case. But, what is much more to the purpose, the court that tried the case found as a fact that the loan proposed was actually made, and that no renewal of any previous advance entered into the transaction at all. Unless this finding was wholly unsupported by evidence, we do not see that the judgment can be set aside. We think that the finding was that to which all the evidence clearly points.

It is said that the sum called for by the letter of Shine was $15,000 of additional cash, over and above what O'Neil & Co. had already received from the Central Bank.

Let it be so ; and when O'Neil & Co. have received this $15,000, what are they to do with it? To meet, it is presumed, their maturing obligations. What difference can it make in this case that the note endorsed by Peter O'Neil's father was held by the Central Savings Bank? For all that appears, the money may have been paid over the counter of the bank to O'Neil & Co., and they may have applied it to the payment of the note that the bank held. It is probable to every business man that such a futile ceremony was not performed by men with beards on their faces. Banks deal with balances. But suppose it had been done. O'Neil & Co. receive $10,000, and pay it back at once to the bank from which they got it, because the bank holds their paper for that amount maturing that day. Shine desired, and expressed his desire, that if the Central Bank could not make the loan, the collateral should be applied to raising the money elsewhere. If O'Neil had gone to another bank with the Walker note and got the $15,000, his firm must have paid the note of $10,000 held by the Central Bank, and

due that day ; at any rate, they might have done so. Certainly the Central Bank could not have prevented them from doing it. It would have been bound to receive the money and give up the note. And what difference does it make to Shine whether the money is raised in the bank that holds the maturing paper, or elsewhere? And why should the child's play be performed of solemnly counting out $10,000 on the counter, to be replaced at once in the heaps from which it was taken, when a stroke of a pen does the whole business? There is nothing whatever in the evidence to raise even a suspicion of the want of perfect good faith on the part of the defendant. It does not appear — there is nothing in the evidence to raise the slightest suspicion — that the Central Bank was not abundantly secured for all due to them by O'Neil & Co. ; that the note they held was not endorsed by a thoroughly solvent and responsible man. But be that as it may, the Central Bank had a legal right to demand payment, on that day, of that note, and the alternative was the business disgrace and ruin of the credit of O'Neil & Co. Did Shine mean that they were to get $15,000 from the Central Bank, and not pay their maturing paper? And if they were to keep their business honor and fulfil their obligations, what can it matter by whom their paper was held?

But the letter of Shine does not say that the Central Bank is to loan to O'Neil & Co. $25,000. It asks a loan of $15,000. It recognizes the fact that O'Neil & Co. are already indebted to the bank. It does not say that they want $15,000 more. It says that they want more money than they have received from the Central Bank, — how much more it does not say, — and suggests that that indebtedness be increased to $15,000 altogether, not to $15,000 over and above the existing debt. The letter is susceptible of this interpretation. To the writer this seems to be its actual meaning. It is quite enough to say that it may mean this.

It says this, in so many words : " O'Neil & Co. can use *some* additional cash over and above the amount already had of you ; lend them $15,000. I will be responsible to that amount. If you can't do it, I will help them to get it elsewhere." It does not say, " Increase your present loan to them to $25,000, and I will be responsible for three-fifths of the amount." It does not say, " Lend them $15,000, and let the notes they now have with you, and which are maturing, be extended." It does not say this, and it does not necessarily imply it.

A surety is not to be charged beyond the precise terms of his engagement. The terms of the guaranty are to be strictly complied with. These are wholesome and well settled rules, and we do not think they are violated by the judgment in this case. We do not think the contract in this case has been stretched beyond its strict letter.

The judgment of the Circuit Court is affirmed. All the judges concur.